**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JACQUELINE DOWNARD<br>2314 Finley Chapel Road<br>Wellston, Ohio 45692,<br><br>        Plaintiff,<br><br>        v.<br><br>CHILLICOTHE KENWORTH, LLC<br>65 Kenworth Drive<br>Chillicothe, Ohio 45601<br><br>    **Serve Also:**<br>    Chillicothe Kenworth, LLC<br>    Capitol Corporate Services, Inc.<br>    4568 Mayfield Road, Suite 204<br>    Cleveland, Ohio 44121<br><br>    -and-<br><br>MICHAEL GIFFEN<br>395 Lorraine Drive<br>Pickerington, Ohio 43147,<br><br>        Defendants. | CASE NO.<br><br>JUDGE:<br><br><br><br>**COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE RELIEF**<br><br>**JURY DEMAND ENDORSED<br>HEREIN** |

Plaintiff, Jacqueline Downard, by and through undersigned counsel, as her Complaint against Defendant Chillicothe Kenworth, LLC and Michael Giffen, states and avers the following:

**PARTIES, VENUE, & JURISDICTION**

1. Downard is a resident of the city of Wellston, Jackson County, Ohio.

2. Kenworth is a foreign limited liability company that does business at 65 Kenworth Drive, Chillicothe, Ross County, Ohio 45601.

3. Kenworth is and, at all times herein, was an employer within the meaning of R.C. § 4112.01 *et seq.*

4.  Giffen is a resident of the state of Ohio.

5.  Giffen was a manager for Kenworth.

6.  This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Downard is alleging a Federal Law Claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e.

7.  All material events alleged in this Complaint occurred in Ross County, Ohio.

8.  This Court has supplemental jurisdiction over Downard's state law claims pursuant to 28 U.S.C. § 1367 as Downard's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

10. Within 300 days of the conduct alleged below, Downard filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 473-2022-00760 against Kenworth ("Downard EEOC Charge").

11. Downard dually filed the Downard EEOC Charge with the EEOC and the Ohio Civil Rights Commission.

12. On or about August 17, 2022, the EEOC issued a Notice of Right to Sue letter to Downard regarding the Downard EEOC Charge.

13. Downard received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit A.

14. Downard has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

15. Downard has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

16. Downard has properly exhausted her administrative remedies pursuant to R.C. § 4112.052.

## FACTS

17. In or about November 2020, Downard began working for Kenworth.

18. Kenworth employed Downard as a Maintenance Unit Manager.

19. Downard is female.

20. Downard was the only female Maintenance Unit Manager at Kenworth.

21. Giffen was Downard's manager.

22. Giffen is male.

23. During Downard's employment, Giffen made comments about Downard's gender ("Sexist Comments").

24. Among the Sexist Comments, Giffen told Downard, "You're a woman. You wouldn't get it."

25. Among the Sexist Comments, Giffen told Downard, "Grow a fucking set of nads. We're all men here."

26. Every unit manager other than Downard had an assistant called a "grade 5 technician."

27. Downard did not have a grade 5 technician assisting her.

28. On multiple occasions, Downard requested a grade 5 technician.

29. Kenworth's failure to assign Downard a grade 5 technician made her job more difficult.

30. In or about March 2021, Downard complained to Giffen that he was discriminating against her due to her gender ("First Report of Discrimination").

31. After the First Report of Discrimination, Giffen started requiring Downard to take orders from Jacob Pechacek.

32. Pechacek was a reliability engineer for Kenworth.

33. Giffen did not require any Maintenance Unit Managers other than Downard to take orders from Pechacek.

34. Prior to the First Report of Discrimination, Kenworth did not require Downard to take orders from Pechacek.

35. Unit managers do not report to reliability engineers at Kenworth.

36. In or about April 2021, Pechacek instructed maintenance workers to alter fans, belts, and motors on an assembly line ("Alterations").

37. In or about April 2021, Pechacek falsified safety documents ("Falsification").

38. The Alterations posed a safety hazard to employees.

39. Downard reasonably believed that the Alterations posed a safety hazard to employees.

40. The Falsification posed a safety hazard to employees.

41. Downard reasonably believed that the Falsification posed a safety hazard to employees.

42. In or about April 2021, Downard made reports to Brian Putnam and Kenworth's ethics department ("April 2021 Reports").

43. Putnam was human resources director for Kenworth.

44. In the April 2021 Reports, Downard reported Pechacek's Alterations.

45. In the April 2021 Reports, Downard reported Pechacek's Falsification.

46. In the April 2021 Reports, Downard reported that Giffen was making her take orders from Pechacek.

47. In the April 2021 Reports, Downard reported that Giffen was retaliating against her for the First Report of Discrimination.

48. Kenworth has a policy against discrimination ("Discrimination Policy").

49. Kenworth's Discrimination Policy precludes retaliation against employees who complain about discrimination.

50. Alternatively, retaliation against employees who complain about discrimination is permitted by Kenworth.

51. Kenworth's Discrimination Policy precludes intimidation against employees who complain about discrimination.

52. Alternatively, intimidation against employees who complain about discrimination is permitted by Kenworth.

53. Kenworth's Discrimination Policy requires employees to report what they reasonably believe is a violation of the Discrimination Policy.

54. Kenworth's Discrimination Policy precludes retaliation against employees who report a violation of the Discrimination Policy.

55. Alternatively, retaliation against employees who report a violation of the Discrimination Policy is permitted by Kenworth.

56. Kenworth's Discrimination Policy precludes intimidation against employees who report a violation of the Discrimination Policy.

57. Alternatively, intimidation against employees who report a violation of the Discrimination Policy is permitted by Kenworth.

58. After the April 2021 Reports, Putnam told Giffen and Pechacek that Downard made the April 2021 Reports.

59. After the April 2021 Reports, Giffen told employees in maintenance management that they needed to "watch [their] backs" around Downard.

60. Giffen told employees in maintenance management that they needed to "watch [their] backs" around Downard because she made the April 2021 Reports.

61. Giffen told Downard, "You need to watch your back," because of her April 2021 Reports.

62. On or about May 7, 2021, Downard made a written report to Putnam ("May 2021 Report").

63. In the May 2021 Report, Downard complained that Giffen was discriminating against her based on her gender.

64. In the May 2021 Report, Downard complained that Giffen was retaliating against her for reporting discrimination.

65. In the May 2021 Report, Downard complained about the Alterations.

66. In response to the May 2021 Report, Kenworth did not give Giffen a verbal warning.

67. In response to the May 2021 Report, Kenworth did not give Giffen a written warning.

68. In response to the May 2021 Report, Kenworth did not give Giffen a final warning.

69. In response to the May 2021 Report, Kenworth did not give Giffen a demotion.

70. In response to the May 2021 Report, Kenworth did not give Giffen a suspension.

71. In response to the May 2021 Report, Kenworth did not terminate Giffen's employment.

72. In response to the May 2021 Report, Kenworth did not discipline Giffen at all.

73. After the May 2021 Report, Giffen stopped speaking with Downard at work.

74. After the May 2021 Report, Giffen stopped including Downard in emails sent to other members of management.

75. Giffen's excluding Downard from emails hindered Downard's ability to perform her job.

76. After the May 2021 Report, Defendants changed Downard's hours.

77. After the May 2021 Report, Defendants cut Downard's pay rate.

78. Hereinafter, Paragraphs 73 through 77 are called the "Retaliatory Behavior."

79. The Retaliatory Behavior would deter a reasonable person from making reports of discrimination.

80. The Retaliatory Behavior would deter a reasonable person from reporting unsafe working conditions.

81. The Retaliatory Behavior was an adverse employment action.

82. The Retaliatory Behavior was an adverse action.

83. Defendants did the Retaliatory Behavior intentionally.

84. Defendants did the Retaliatory Behavior willfully.

85. Defendants did the Retaliatory Behavior in retaliation for Downard's April 2021 Reports.

86. Defendants did the Retaliatory Behavior in retaliation for Downard's May 2021 Report.

87. Defendants did the Retaliatory Behavior because of Downard's gender.

88. On or about February 5, 2022, Giffen gave Downard a negative performance review.

89. On or about February 5, 2022, Giffen placed Downard on a "personal growth plan" ("PGP").

90. Giffen did not place Downard's similarly-situated male coworkers on PGPs.

91. Giffen told Downard that her employment would be terminated if she did not meet the goals in the PGP.

92. The PGP contained goals that were subjective.

93. The PGP contained goals that were unrealistic.

94. The PGP required Downard to have face-to-face meetings with managers throughout the plant on how she and her subordinates were performing.

95. Defendants did not require managers other than Downard to have face-to-face meetings with managers throughout the plant on how they and their subordinates were performing.

96. In the PGP, Giffen gave Downard additional job duties.

97. In or about March 2022, Downard's doctor diagnosed her with diabetes and a form of cardiovascular disease.

98. In or about March 2022, Downard's doctor told her that stress from work was negatively impacting her health.

99. In or about March 2022, Downard's doctor told her, "Your job is not worth your health."

100. On or about March 28, 2022, a reasonable person in Downard's position would have felt compelled to resign.

101. On or about March 28, 2022, Downard reasonably believed that her termination was imminent.

102. On or about March 28, 2022, Defendants constructively discharged Downard.

103. On or about March 28, 2022, Defendants constructively discharged Downard because of her gender.

104. On or about March 28, 2022, Defendants constructively discharged Downard in retaliation for her opposing discrimination.

105. On or about March 28, 2022, Defendants constructively discharged Downard in retaliation for her reporting safety hazards.

106. As a direct and proximate result of Defendants' conduct, Downard suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT I: GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

**(Defendant Kenworth)**

107. Downard restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

108. Downard is a member of a statutorily protected class based on her gender under Title VII.

109. Defendants treated Downard differently than other similarly-situated employees based on her gender.

110. Defendants discriminated against Downard on the basis of her gender throughout her employment with the company.

111. Defendants terminated Downard's employment without just cause.

112. Defendants terminated Downard's employment based on her gender.

113. Defendants' discrimination against Downard based on her gender violates Title VII.

114. As a direct and proximate result of Defendants' conduct, Downard suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**COUNT II: GENDER DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.***

**(Defendant Kenworth)**

115. Downard restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

116. Downard is a member of a statutorily protected class based on her gender under R.C. § 4112.02.

117. Defendants treated Downard differently than other similarly-situated employees based on her gender.

118. Defendants discriminated against Downard on the basis of her gender throughout her employment with the company.

119. Defendants terminated Downard's employment without just cause.

120. Defendants terminated Downard's employment based on her gender.

121. Defendants' discrimination against Downard based on her gender violates R.C. § 4112.01 *et seq.*

122. As a direct and proximate result of Defendants' conduct, Downard suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT III: RETALIATION IN VIOLATION OF TITLE VII

### (Defendant Kenworth)

123. Downard restates each and every prior paragraph of this complaint, as if it were fully restated herein.

124. As a result of Defendants' discriminatory conduct described above, Downard complained about the discrimination she was experiencing.

125. Subsequent to Downard's reporting of discrimination, Defendants required Downard to take orders from Pechacek.

126. Subsequent to Downard's reporting of discrimination, Defendants did the Retaliatory Behavior.

127. Subsequent to Downard's reporting of discrimination, Defendants placed Downard on the PGP.

128. Subsequent to Downard's reporting of discrimination, Defendants constructively discharged Downard.

129. Defendants' actions were retaliatory in nature based on Downard's opposition to the unlawful discriminatory conduct.

130. Pursuant to Title VII, it is an unlawful discriminatory activity to retaliate against an employee for opposing discrimination.

131. As a direct and proximate result of Defendants' conduct, Downard suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## **COUNT IV: RETALIATION IN VIOLATION OF R.C. § 4112.02(I)**

### **(All Defendants)**

132. Downard restates each and every prior paragraph of this complaint, as if it were fully restated herein.

133. As a result of Defendants' discriminatory conduct described above, Downard complained about the discrimination she was experiencing.

134. Subsequent to Downard's reporting of discrimination, Defendants required Downard to take orders from Pechacek.

135. Subsequent to Downard's reporting of discrimination, Defendants did the Retaliatory Behavior.

136. Subsequent to Downard's reporting of discrimination, Defendants placed Downard on the PGP.

137. Subsequent to Downard's reporting of discrimination, Defendants constructively discharged Downard.

138. Defendants' actions were retaliatory in nature based on Downard's opposition to the unlawful discriminatory conduct.

139. Pursuant to R.C. § 4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

140. As a direct and proximate result of Defendants' conduct, Downard suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT V: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### (All Defendants)

141. Downard restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

142. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, including R.C. §§ 4101.11 and 4101.12, or in the common law, requiring employers to maintain a safe environment for employees and frequenters.

143. Defendants constructively discharged Downard.

144. Defendants' constructive discharge of Downard jeopardizes these public policies.

145. Defendants' constructive discharge of Downard was motivated by conduct related to these public policies.

146. Defendants had no overriding business justification for discharging Downard.

147. As a direct and proximate result of Defendants' conduct, Downard has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT VI: UNLAWFUL AIDING, ABETTING, AND INCITING OF DISCRIMINATION

148. Downard restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

149. Pursuant to R.C. § 4112.02(J), it is unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice..."

150. Giffen aided, abetted, incited, coerced, and/or compelled Kenworth's discriminatory constructive discharge of Downard.

151. Giffen aided, abetted, incited, coerced, and/or compelled Kenworth's discriminatory treatment of Downard.

152. Giffen violated R.C. § 4112.02(J) and § 4112.99 by aiding, abetting, and inciting discrimination.

153. As a direct and proximate result of Giffen's conduct, Downard has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Downard respectfully requests that this Honorable Court grant the following relief:

(a) Issue a permanent injunction:

    (i) Requiring Kenworth to abolish discrimination, harassment, and retaliation;

    (ii) Requiring allocation of significant funding and trained staff to implement all changes within two years;

    (iii) Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to investigate complaints promptly and/or take effective action to stop and deter prohibited personnel practices against employees;

    (iv) Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    (v) Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

(b) Issue an order requiring Kenworth to restore Downard to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(c) An award against each Defendant of compensatory and monetary damages to compensate Downard for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

(e) An award of reasonable attorneys' fees and non-taxable costs for Downard claims as allowable under law;

(f) An award of the taxable costs of this action; and

(g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Trisha Breedlove*_____
Trisha Breedlove (0095852)
Paul Filippelli (0097085)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (216) 291-4744
Fax:     (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com
Email: paul.filippelli@spitzlawfirm.com
*Attorneys for Plaintiff Jacqueline Downard*

**JURY DEMAND**

Plaintiff Downard demands a trial by jury by the maximum number of jurors permitted.

*/s/ Trisha Breedlove*_____
Trisha Breedlove (0095852)
Paul Filippelli (0097085)

14